MARQUAYLE MARTIN,       )
                         )

       Plaintiff,         )
                         )

v.                      )     Cause No. 1:15-CV-274
                         )

CITY OF FORT WAYNE, BARRY   )
PRUSER, MICHAEL LONG,      )
MARTIN P. GROOMS, DERRICK   )
DEMOREST, and TODD HUGHES,  )
                         )

       Defendants.       )

## OPINION AND ORDER

This matter is before the Court on cross motions for summary judgment. The Defendants, including the City of Fort Wayne and five Fort Wayne police officers, filed a motion for summary judgment (Docket Entry 26), Plaintiff Marquayle Martin filed a response in opposition (DE 28), and the Defendants filed a reply (DE 29) and a sur-reply (DE 35). Martin then filed his own motion for partial summary judgment (DE 40), the Defendants filed a response in opposition (DE 45), and Martin filed a reply brief (DE 55). For the reasons discussed below, the Defendants' motion for summary judgment (DE 26) is GRANTED in part and DENIED in part; and the Plaintiff's motion for partial summary judgment (DE 40) is DENIED. The Defendants' motion is: GRANTED as to Plaintiff's claims against the individual Defendants for excessive force, failure to intervene, and battery; and GRANTED as to the Plaintiff's claims against the City of Fort Wayne under *Monell v. Dept of Soc. Svcs.* and under *respondeat superior* (based on the same allegations of excessive force and battery). The Defendants' motion is DENIED as to the issue of qualified immunity and DENIED as to the Plaintiff's claim for punitive damages.

Both the Defendants' motion for summary judgment and the Plaintiff's motion for partial summary judgment are DENIED as to the Plaintiff's Fourth and Fourteenth Amendment claims against all Defendants for the alleged illegal search and seizure of his vehicle and those claims remain pending.

## BACKGROUND

On June 27, 2014, Martin was driving in Fort Wayne with four passengers–two adult females, one adult male, and a five-year-old girl. Je'Carri Martin and Taylor Carswell, the adult women, are the Plaintiff's cousins and the young girl is his daughter. Both women had valid driver's licenses at the time (an important fact, as discussed later). The adult male, who first identified himself to officers as William Causey, eventually admitted his real name was Teron Walker. Since Walker had outstanding active warrants he was arrested at the scene. Moments before Martin was stopped, as he was driving in the vicinity of St. Mary's and Sherman streets just north of downtown, he got involved in a sort of "road rage" incident. While the phrase "road rage" implies some sort of heated, if not violent, dispute between drivers, this encounter ended before it escalated to that point, since Defendant police officer Michael Long appeared on the scene and pulled Martin over. According to Martin and his passengers, another vehicle, identified only as a "green vehicle," was in front of Martin's car and the driver of that other vehicle was allegedly hitting his brakes, causing Martin to have to brake hard to avoid a collision. This made Martin angry and he tailgated the green vehicle for a short time before he was stopped by police. The driver of the green vehicle drove off and was not stopped. At one point during this encounter, Martin threw coins out of the sunroof of his vehicle, striking the green vehicle. Officer Long was patrolling in the area, saw part of the confrontation between the two vehicles,

and pursued them for a short time before Martin pulled his car into a parking lot. Long, who was in full police uniform and driving an unmarked police car, followed Martin into the lot, drew his sidearm and pointed it at Martin's vehicle, and waited for backup officers to arrive. Defendant officer Barry Pruser was the next police officer to arrive on the scene–just moments after Long–and Demorest, Grooms, and Hughes arrived moments after Pruser. The officers ordered everyone out of Martin's vehicle. Long and Pruser contend that Martin was uncooperative at first, ignoring their commands to keep his hands up, walking around casually and refusing to stand still, and demonstrating what the officers contend was "continual intentional disobeying of commands." Defendants' Designation of Evidence, Pruser Supplemental Narrative (DE 26-1), p. 5. In short, the Defendant officers contend that Martin was uncooperative and refused to obey their commands during the stop, necessitating what they maintain was a reasonable use of force to effectuate his arrest on a charge of aggressive driving. Martin maintains that there was nothing at all reasonable about the amount of force used against him, and that it was excessive to the point of being unconstitutional. Martin insists that "at all times, he attempted to comply with the commands of officers." Plaintiff's Response in Opposition (DE 28), p. 4 (citing Plaintiff's Affidavit, Exh. A). Despite his alleged compliance, Martin contends that "officers on the scene repeatedly yelled at him, and had him raise his hands above his head continuously for more than several minutes so that, at times, the officers' commands were confusing and . . . his arms sagged due to the difficulty and pain he suffered in trying to keep them raised for an extended period of time." *Id*., pp. 4-5. Martin states that "[d]uring the traffic stop . . . Defendant Pruser ordered him to kneel in gravel . . ." and that he "was handcuffed by Defendant Pruser after kneeling in the gravel as instructed." *Id*., p. 5. Martin also alleges that Pruser "bent [Martin's] arms in a painful

manner, then stepped on Plaintiff's calf, then, after Plaintiff complained of the battery, Defendant Pruser choked him." *Id*. Finally, Martin contends that "after this encounter with Defendant Pruser, Defendant Long slammed [Martin] while handcuffed against a police vehicle." *Id*. Martin contends that the actions of Long and Pruser were excessive under the circumstances, especially given that the officers do not "claim that [Martin] posed a danger to officers or others[,]" . . . or that "he had a firearm or weapon[,]" . . . or that "he tried to attack or injure officers." *Id*., p. 11. Consequently, argues Martin, the officers' use of force to arrest him was unreasonable under the circumstances and therefore unconstitutional.[1]

Once Martin was arrested and secured, Long called a wrecker service and had Martin's vehicle towed from the scene. Long states that he did so "because [Martin] was arrested for aggressive driving and the vehicle was involved in the offense. I was also concerned because the green vehicle involved in the incident had not been stopped and the aggressive driving could have resumed had Mr. Martin's vehicle been driven from the scene." Defendants' Designation of Evidence (DE 26-2), Long Affidavit, p. 4. Once again, Martin has a different take on this, alleging that the Defendant officers violated his constitutional rights by searching his car without probable cause or a warrant, and by seizing his car even though the officers knew that a licensed

---

[1] Martin argues that Pruser's conduct amounted to excessive force in violation of his Fourth Amendment rights, and so Defendants Long, Grooms, Demorest, and Hughes are liable to him for failing to intervene to prevent or stop that excessive force, even though they did not personally use any force against him. As this Court has noted, "[i]t is well established that 'in a § 1983 action alleging that police violated the plaintiff's Fourth Amendment rights by subjecting him to excessive force, a defendant police officer may be held to account both for his own use of excessive force on the plaintiff . . . as well as his failure to take reasonable steps to attempt to stop the use of excessive force used by his fellow officers[.]'" *Sheehan v. Noble County Sheriff's Dep't*, 2016 WL 7100555 *13, n. 4 (N.D.Ind. Dec. 6, 2016) (quoting *Sanchez v. City of Chicago*, 700 F.3d 919, 925–26 (7th Cir. 2012)).

driver was present and able to remove the vehicle after Martin's arrest. This matter of the search and seizure of Martin's vehicle is also the subject of the Plaintiff's motion for partial summary judgment, and will be discussed in more detail later.

Based on those facts, Martin filed his complaint in this case asserting the following claims under 42 U.S.C. § 1983:

1) Fourth Amendment excessive force claims against Long and Pruser and failure to intervene claims against all of the Defendant officers in their individual capacities;

2) a claim against the City of Fort Wayne under *Monell v. Dept of Soc. Svcs.*, 436 U.S. 658 (1978) for alleged unconstitutional policies or customs "which lead to the arrest, detention, and use of excessive force upon the Plaintiff";

3) Indiana state law battery claims against the officers "for which the City of Fort Wayne, as their employer, is liable based upon the doctrine of *respondeat superior*"; and

4) Fourth Amendment unreasonable search and seizure claims against all Defendants (the officers in their individual capacities and the City in its official capacity, again under *Monell*) for the alleged illegal search and seizure of his vehicle.

Second Amended Complaint, pp. 1-2. Martin seeks compensatory and punitive damages, attorney's fees, and costs. *Id*., p. 5. The Defendants seek summary judgment on all of Martin's claims and Martin seeks partial summary judgment on the issue of the search and seizure of his vehicle.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning

material facts are genuine where the evidence is such that a reasonable jury could return a verdict

for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding

whether genuine issues of material fact exist, the court construes all facts in a light most

favorable to the non-moving party and draws all reasonable inferences in favor of the non-

moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual

dispute between the parties," *id.*, 477 U.S. at 247, nor the existence of "some metaphysical doubt

as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586

(1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.*,

209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for

resolving factual disputes. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if

genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion,

summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.*, 975

F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir. 1989).

If it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish

his or her case, summary judgment is not only appropriate, but mandated. *See Celotex*, 477 U.S.

at 322; *Ziliak v. AstraZeneca LP*, 324 F.3d 518, 520 (7th Cir. 2003). Finally, and perhaps most

importantly, "[t]he court must not weigh the evidence presented or determine credibility of

witnesses; the Seventh Circuit instructs that 'we leave those tasks to factfinders.'" *Winston v.*

*Sauvey*, 2016 WL 7480393, at *1 (E.D. Wis. Dec. 29, 2016) (quoting *Berry v. Chicago Transit*

*Auth.*, 618 F.3d 688, 691 (7th Cir. 2010)).

## DISCUSSION

### I. Excessive force claims and battery claims.

The Defendants argue that the amount of force used against Martin on the day of his arrest was reasonable under the circumstances, and they submitted a DVD of "Officer Michael Long's in-car video for [the] incident . . . on June 27, 2014," that they claim supports (and in fact proves) their position. Defendants' Exh. H (DE 25).[2] In fact, the Defendants contend that the videotapes refute Martin's version of events: "Officer Long's in-car video . . . contradicts Martin's claim that he was slammed against the back of Officer Long's car after he was handcuffed." Defendants' Sur-Reply (DE 35), p. 1.

The question in Fourth Amendment excessive force claims is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Conner*, 490 U.S. 386, 397 (1989). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). The question is "whether the totality of the circumstances" justifies the officers' actions. *Graham*, 490 U.S. at 396. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id*. (quoting *Johnson v. Glick*, 481 F.2d 1028,1033 (2d Cir. 1973)).

---

[2] Martin also filed a copy of the Long in-car video, along with the in-car video from Demorest's patrol car. Plaintiff's Exhs. D and E (DE 42).

Martin's contentions notwithstanding, this traffic stop was textbook. The officers and citizens remained calm (with the exception of Martin, who became somewhat verbally combative after his arrest). Police ordered each person in Martin's vehicle to exit, one person at a time starting with Martin, separated them, and questioned them. Carswell was handcuffed and seated in the back of Long's patrol car for several minutes and she can be heard talking to an officer about the incident. All the individuals were cooperative (with the exception of Walker's initial attempt to lie about his identity). The officers were polite in their interactions with Martin's daughter, helping her out of the vehicle and offering calming words. Carswell explained to officers what happened–that the driver of the green car was repeatedly "hitting" his or her breaks, which angered Martin–and Martin's daughter told police that her father threw coins out of his sunroof at the other vehicle. This information confirmed what Long observed before he stopped Martin, which brings us to the videotapes.

The videotape from Long's patrol clearly shows Martin driving dangerously close behind a green sedan. Defendant's Exh. H, Long video. At several points, Martin can be seen breaking hard and suddenly as the driver of the green car presumably does the same thing. While both drivers hit their brakes several times, they were not as apt to do so when they encountered stop signs. Long pursues both vehicles as they drive recklessly through busy city streets (even forcing one car to stop in the middle of an intersection to avoid colliding with the two renegade vehicles). The two vehicles run a stop sign before Martin pulls over into a parking lot, with Long right behind him. The green vehicle drives off. All of that takes place in the first minute and 45 seconds or so of the video. Long orders the people in Martin's vehicle to put their hands out the

window and Martin raises his hands through his sunroof.[3] He lowers his arms several times and then raises them again when ordered to do so. It is undisputed that Long had his gun unholstered at this point, and apparently trained on Martin's vehicle, although that is not visible in this video. The videotape from Long's car is a "split screen." One camera records everything taking place in front of Long's car while a second camera–which is aimed in the opposite direction–records everything taking place inside the vehicle and outside the rear window. At approximately the five minute and 40 second mark, Martin can be seen near the back of the patrol car, i.e., in view of the inside camera, as he is leaned (certainly not "slammed," as he claims) over the rear of Long's vehicle after being handcuffed. At about the six minute and 55 second mark, Martin's cousin Taylor Carswell, who is handcuffed, is placed in the back seat of Long's car, where she sits calmly and quietly for several minutes. Carswell is released from the patrol car after about 12 minutes or so and the handcuffs are removed. At about the 29 minute and 30 second mark, Martin is placed in the back of Long's patrol car. He has no visible injuries and sits quietly for several minutes. At the 36 minute mark, the officers can be seen opening the back "hatch" door of Martin's SUV and searching the vehicle. It is undisputed that no contraband was found. Just after the 42 minute mark, officers (mostly Long), Martin and Carswell have a conversation about certain logistical matters, such as which of Martin's keys on his key chain should be turned over

---

[3] The Long in-car videotape does not capture much of anything in the way of audio–at least not outside the patrol car. What audio there is on this video captures conversations that took place *inside* Long's car, which the Court will discuss in a moment. The second videotape, from Demorest's patrol car, includes much more audio. Together, the recordings capture virtually the entire encounter between the Plaintiff and the Defendant officers–from the moment Long begins chasing Martin to the time Long leaves the scene to transport Martin to the Allen County Jail. This evidence, as discussed at length in this order, confirms the Defendant officers' version of events and refutes Martin's allegations of excessive force.

to his cousins and whether Martin wanted to give his cousins ten dollars out of his wallet before he is taken to jail. Martin tells Long that he wants all of his keys (with the exception of his car keys since his vehicle was going to be towed) and the money given to his cousins. Officers also allowed Martin's daughter to approach the patrol car to speak with her father before he is taken to jail. Martin can also be heard telling Carswell to get the officers' names and badge numbers and to call a man named "Ricky" and tell him about this incident. At about the 43 minute and 35 second mark, Martin begins to complain to Long about being arrested even though police hadn't "talked to the other guy," meaning the driver of the green car. Long explains the obvious–that he could not stop two vehicles simultaneously–and Martin continues to protest being arrested while the other driver was not stopped or questioned. A few minutes later Martin, still sitting handcuffed in the back of Long's patrol car, talks for several minutes with his cousins and says something to Carswell (or perhaps Ms. Martin) about recording. The woman can be heard responding that her phone was almost "dead" so she could not record anything. Martin is heard talking about recordings being made by police but asserts at one point that the police videos "won't show" everything, implying that whatever recordings were being made at the time of the encounter would somehow not accurately reflect what occurred. Several times Martin can be heard stating that he "ain't nothing but a hard-working man," and complaining that police can "mess with" anyone they please. As Martin is transported to the jail, he complains several times about his treatment during his arrest, claiming that he was forced to kneel in gravel, that Pruser hurt his wrists by yanking on Martin's handcuffs, and that Pruser "choked" him when Martin complained about what he thought was rough treatment. Before Long leaves to take Martin to jail, Martin's SUV can be seen on the back of a wrecker, which is preparing to leave the scene

with the impounded vehicle. The videotape ends as Long pulls into the sally port of the Allen County Jail. The second videotape, from Demorest's vehicle, also captures most of what occurred at the scene and, fortunately, contains much more audio. Plaintiff's Exh. E (DE 42). This videotape also confirms the Defendant officers' version of events.

The evidence is conclusive, and no reasonable juror could find in favor of Martin on this claim, even when all reasonable inferences are drawn in his favor. As the Defendants correctly state, "[i]t is well settled that 'an officer who has the right to arrest an individual also has the right to use some degree of physical force or threat to effectuate the arrest.'" Defendants' Memorandum (DE 27), p. 14 (quoting *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009)).

Martin argues that the degree of force used on him was more than was necessary to effectuate his arrest. He claims that "Defendant Pruser ordered him to kneel in gravel and, though Plaintiff did complain about this instruction, he complied and, though he does not know the exact time it happened, Plaintiff was handcuffed by Defendant Pruser after kneeling in the gravel as instructed. . . . Plaintiff states that during the course of the encounter which he was complying with [sic], Defendant Pruser bent his arms in a painful manner, then stepped on Plaintiff's calf, then, after Plaintiff complained of the battery, Defendant Pruser choked him." Plaintiff's Response (DE 28), p. 5. Martin summarizes his position by stating that he "was held at gunpoint following a stop for traffic violations, forced to hold his hands above his head for a painfully long period of time, made to kneel in gravel, choked and stepped on, battered, handcuffed in a painful manner, and slammed against a police vehicle while in handcuffs." *Id*., p. 10. Read in isolation, this language paints a troublesome picture. After all, even if Martin was not strictly complying with every order police gave him, it would be difficult to imagine that he should be

subjected to such extreme force during his arrest. The problem is that the evidence does not support Martin's version of events and, more importantly, establishes that the amount of force used against him was reasonable under the circumstances, even if he believed it to be uncomfortable or painful at times.

Martin doesn't back down, though, and points out that even "'one violent push and poke' will constitute excessive force when there is no provocation.'" *Id.*, p. 17 (quoting *DuFour-Dowell v. Cogger*, 969 F.Supp. 1107, 1120 (N.D.Ill. 1997) (quoting, in turn, *Lanigan v. Vill. of East Hazel Crest*, 110 F.3d 467, 475-76 (7th Cir. 1997)). Martin argues that "[u]nder this standard, Defendant Officers' actions of slamming Plaintiff, stepping on Plaintiff, and bending his arms were not justified . . . ; nor was their over-tightening of handcuffs . . . ; nor was holding Plaintiff at gunpoint for an extended period of time, including while he was kneeling on gravel in front of an officer, when Plaintiff posed no danger and had been detained merely for traffic violations[.]" *Id.* (internal citations omitted). Once again, though, the language Martin uses to characterize the force used against him exaggerates what happened. More importantly, Martin's version of the encounter, as he presents it in his briefs, is mostly a subjective one. As the Defendants correctly note, "[t]he Fourth Amendment's 'objective reasonableness' standard examines actions 'from *the perspective of a reasonable officer* at the scene.' . . . It is the officers' perspective, *not Martin's perspective*, that is relevant in determining reasonableness." Defendants' Reply (DE 29), p. 4 (quoting *Graham v. Conner*, 490 U.S. 386, 396 (1989)) (italics added). This is so because the Court's duty is to examine "whether the officers' actions are '*objectively* reasonable' in light of the facts and circumstances *confronting them* . . . ." *Id.* at 397 (italics added).

The facts and circumstances the Defendant officers confronted in this case, all of which are captured on the recordings (and recounted in Long's and Pruser's affidavits), go something like this. Long personally observes two vehicles engaging in very dangerous and aggressive driving; he chases the vehicles until one of them (Martin, of course) turns into a parking lot; he observes that there are at least four people in the vehicle, so he trains his firearm on the vehicle for a short time until back-up officers arrive; he instructs Martin to raise his hands outside his vehicle and while Martin eventually complies, he lowers his hands back into vehicle several times and has to be ordered again to raise them; neither Long nor the other officers knew what spurred the dangerous encounter between Martin and the green sedan; Walker lies to the officers about his identity; and Martin, while mostly compliant with officers' instructions, lowers his arms after being ordered to hold them up (even after he exited his vehicle) and turns toward the officers a couple times after being instructed to keep his back to them. This was a tense situation, initiated by Martin's dangerous, aggressive driving and his failure to comply with all of the officers' commands.[4] Martin's contention that he was stopped for a "mere" traffic violation and that the Defendant officers overreacted under those circumstances is his own subjective

---

[4] The Defendants maintain that Martin "was not completely complying with our commands . . ." (Long Affidavit (DE 26-2), ¶ 16), while Martin maintains that he "was conforming his actions as closely as he could to officers' numerous commands[,]" (Plaintiff's Response, p. 17). So, the Defendants contend that Martin was not complying with their directives but they qualify that a bit by using the phrase "not completely." Martin contends he followed officer's orders at all times, but qualifies that a bit by using the phrase "as closely as he could." In a way, both sides are tacitly conceding that Martin was not *completely* compliant or *completely* noncompliant. This is supported by the video and audio recordings, which show that Martin did not always respond immediately or precisely to officers' directives (i.e., lowering his arms several times, not keeping his back turned to officers, and so on), but which also show that Martin's "noncompliant" behavior did not rise to the level of "continual intentional disobeying of commands," as the Defendants characterize it.

interpretation of the facts. Looked at objectively, however, this "mere" traffic violation occurred because two people were driving recklessly and aggressively, endangering themselves, their passengers (including, as it turned out, Martin's five-year-old daughter) and other drivers or pedestrians. This is not the Court's opinion, nor does it require a weighing of evidence–the first two minutes of Long's in-car video prove this fact. After he is stopped, Martin fails to keep his hands visible outside of his vehicle, lowering them back inside the vehicle several times. Minutes after all this, the officers learn that one of Martin's passengers was lying about his identity. This was more than a "mere" traffic stop–it was a tense situation for many reasons, and the Defendant officers acted reasonably under the circumstances, even if Martin *believes* otherwise.[5]

As stated above, Martin cites several cases holding that sometimes even a seemingly minor amount of force can be unconstitutionally excessive under certain circumstances, such as "'one violent push or poke'" inflicted "'when there is no provocation.'" Plaintiff's Response, p. 17 (quoting *Lanigan*, 110 F.3d at 475-76). But these cases are not factually analogous to the present situation.

"'In order to establish an excessive force claim under § 1983, plaintiffs must demonstrate that a state actor's use of force was 'objectively unreasonable' under the circumstances.'" *Jones*

---

[5] The Indiana legislature obviously felt that aggressive driving is a more serious offense than a "mere traffic violation," given that a violation of the applicable statute is a criminal misdemeanor. I.C. § 9-21-8-55(c). In contrast, traffic violations such as speeding or running a stop sign are generally only civil infractions. "Infractions are civil, rather than criminal, in nature." *Byrd v. State*, 6 N.E.3d 464, 466 (Ind.Ct.App. 2014) (citing *Rosenbaum v. State*, 930 N.E.2d 72, 74 (Ind.Ct.App. 2010)), *trans. denied.*

*v. Philips, et al.*, 2016 WL 3255022, at *3 (E.D. Wis. June 13, 2016) (quoting *Thomas v. City of*

*Chicago*, 472 F.3d 444, 454 (7th Cir. 2006). . . . "An officer's use of force is unreasonable from a

constitutional point of view only if, 'judging from the totality of the circumstances at the time of

the arrest, the officer used force greater than necessary to make the arrest.'" *Id*. (quoting

*Gonzalez v. City of Elgin*, 578 F.3d 526, 539 (7th Cir. 2009)). The analytical framework the

Court uses to assess such claims is as follows:

> Where, as here, an excessive force claim "arises in the context of an arrest or
> investigatory stop of a free citizen, it is most properly characterized as one
> invoking the protections of the Fourth Amendment . . . " *Graham v. Connor*, 490
> U.S. 386, 394, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Determining
> whether force used to effect a seizure is "reasonable" under the Fourth
> Amendment[:]
>
>> requires a careful balancing of "'the nature and quality of the intrusion on
>> the individual's Fourth Amendment interests'" against the countervailing
>> governmental interests at stake . . . Our Fourth Amendment jurisprudence
>> has long recognized that the right to make an arrest or an investigatory stop
>> necessarily carries with it the right to use some degree of physical coercion
>> or threat thereof to effect it.
>
> *Graham*, 490 U.S. at 396, 109 S.Ct. at 1871 (citations omitted). The test, in short,
> is one of "objective reasonableness," to be determined from the totality of the
> circumstances. *O'Toole v. Kalmar*, 1990 WL 19542 . . . (N.D.Ill. 1990).

*Smith v. City of Joliet*, 809 F.Supp. 48, 49-50 (N.D. Ill. 1991), *aff'd*, 965 F.2d 235 (7th Cir.

1992). The Supreme Court explained in *Graham* that "[t]he calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second

judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of

force that is necessary in a particular situation." *Graham*, 490 U.S. at 396. This means that police

can, assuming the circumstances warrant it, point their firearms at citizens and use physical force

against them to complete an arrest, all without running afoul of the Fourth Amendment.

The Fourth Amendment provides us all protection from objectively unreasonable force, not subjectively unreasonable discomfort. The Court doesn't doubt that Martin experienced discomfort when he was forced to hold his arms up for several minutes (although his statement that it was "a painfully long period of time" is a stretch–it was a couple minutes or so–and his assertion that "he suffered [pain] in trying to keep them raised" smacks of dramatization) or when Pruser stepped on his foot or put his arm around Martin's neck so he could handcuff him, or when he had to kneel in gravel, or when the handcuffs hurt his wrists. And if officers had no justification for any of this, Martin might have a case. But the amount and degree of force used in this instance was reasonable in light of the totality of the circumstances the Defendant officers confronted at the time.

For example, Martin argues that officers used excessive force by pointing their firearms at his car while ordering him and his passengers to exit the vehicle. It is true that "[p]ointing a loaded gun at [a citizen] is a display of deadly force because it creates more than a remote possibility of death." *Schall v. Vazquez*, 322 F.Supp.2d 594, 600 (E.D. Pa. 2004). But it is equally well established that "while police are not entitled to point their guns at citizens when there is no hint of danger, they are allowed to do so when there *is* reason to fear danger." *Baird v. Renbarger*, 576 F.3d 340, 346 (7th Cir. 2009) (emphasis in original); *see also Wilkins v. May*, 872 F.2d 190, 194 (7th Cir. 1989) ("[T]he action of a police officer in pointing a gun at a person is not, in and of itself, actionable . . . Where the officer merely points a gun at a suspect in the course of arresting him, the suspect would have no basis for claiming that he had been seized with excessive force in violation of the Constitution"); *Williams v. City of Champaign*, 524 F.3d 826, 828 (7th Cir. 2008) (when police officer believes occupant of vehicle might be armed, he

must "approach with utmost caution, which may include pointing a gun at the occupants.");

*Foote v. Dunagan*, 33 F.3d 445, 448 (4th Cir. 1994) (an officer is "'authorized to take such steps as [are] reasonably necessary to protect [his] personal safety and to maintain the status quo during the course of [a *Terry* ] stop.'") (quoting *United States v. Hensley*, 469 U.S. 221, 235 (1985)); *United States v. Sinclair*, 983 F.2d 598, 602–03 (4th Cir. 1993) (reasonable to draw weapons when stopping suspected drug traffickers even though officers had no reason to believe were armed and dangerous); *United States v. Seni*, 662 F.2d 277, 283 (4th Cir. 1981) (drawing gun reasonable safety precaution where officers have reasonable suspicion of criminal activity), *cert. denied sub nom. Minton v. United States*, 455 U.S. 950 (1982). In this case, Long witnessed Martin's dangerous and aggressive driving, saw that there were four people in Martin's vehicle after it was stopped, and held his firearm at the ready while waiting for back-up officers to arrive–an eminently reasonable action under the circumstances. Once all the occupants were removed from Martin's vehicle, save for his daughter, the Defendant officers holstered their weapons.

Martin also argues that he suffered pain because the handcuffs placed on him were too tight, and cites the case of *Tibbs v. City of Chicago*, 469 F.3d 661 (7th Cir. 2006) in support of his argument. Plaintiff's Response, p. 17. While it is true the court in *Tibbs* noted that an over-tightening of handcuffs can constitute excessive force, the argument is not supported by the facts of this case; and, in fact, it wasn't even a good enough argument for Mr. Tibbs. A closer and more thorough reading of the *Tibbs* case reveals that it actually works against Martin rather than supporting his argument. The Seventh Circuit explained as follows:

We have on occasion recognized valid excessive force claims based on overly

tight handcuffs. In *Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003), there was evidence that the arresting officers handcuffed the plaintiff so tightly she lost feeling in her hands and refused to loosen the cuffs when she told them of the numbness. *Id.* at 774-75, 781. The plaintiff later underwent two carpal tunnel surgeries she said were necessitated by the handcuffing, and we held summary judgment under these circumstances was inappropriate. *Id.* at 775, 780–81.

In *Herzog v. Village of Winnetka*, 309 F.3d 1041 (7th Cir. 2002), we held the plaintiff was entitled to a jury trial on her excessive force claim where she produced evidence that the arresting officer lacked probable cause for the arrest, shoved her to the ground even though she was not resisting, cracked her tooth by forcing a breath-screening device into her mouth, waited over an hour to loosen handcuffs she complained were too tight, and subjected her to blood and urine testing at a hospital, even though she had passed all field sobriety tests and had registered a 0.00 Breathalyzer reading. *Id.* at 1043-44. *See also Lester v. City of Chi.*, 830 F.2d 706, 714 (7th Cir. 1987) (a properly instructed jury could have found excessive use of force if it believed plaintiff's testimony that even though she did not resist arrest, officers threatened to punch her, kneed her in the back, dragged her down a hallway, and handcuffed her so tightly her wrists were bruised).

Tibbs does not cite these cases; at any rate, none is analogous to Tibbs's allegations. The plaintiff in *Payne* told the officers her hands were numb and ultimately underwent two surgeries because of wrist injuries caused by the too-tight handcuffs. *Payne*, 337 F.3d at 774-75, 780-81. Here, Tibbs complained only once to [an officer], gave the officers no indication of the degree of his pain, experienced minimal (if any) injury, and sought no medical care. The plaintiffs in *Herzog* and *Lester* experienced tight handcuffing more akin to the discomfort Tibbs alleges, but the decisions in those cases were hardly based on overly tight handcuffs alone. The *Herzog* and *Lester* plaintiffs presented evidence they had suffered numerous additional injuries, including a cracked tooth, plainly gratuitous blood and urine testing, being kneed in the back, and being dragged down a hallway. *Herzog*, 309 F.3d at 1043-44; *Lester*, 830 F.2d at 714.

The record here indicates the following: Tibbs likely suffered some discomfort and pain from handcuffs that [an officer] applied somewhat too tightly; Tibbs complained to [an officer] once about his handcuffs without elaborating on any injury, numbness, or degree of pain; Tibbs was handcuffed for about twenty-five to thirty minutes (from the time of his arrest to his arrival at the lockup facility); he experienced redness on his wrists for less than two days; and he neither sought nor received medical care for any alleged wrist injury. Tibbs cites no cases in which any court has permitted a plaintiff to reach a jury based on such mild allegations. We agree with the district court that no reasonable jury could find [the

officer's] actions were objectively unreasonable.

*Tibbs v. City of Chicago*, 469 F.3d at 666. The result is the same here. Martin claims that he experienced pain and discomfort during his encounter with the Defendant officers, especially with regard to Pruser's use of physical restraint and over-tightening of the handcuffs. Martin's complaints are almost identical to those asserted by Mr. Tibbs–and they are insufficient to survive summary judgment for the same reasons. Martin does not allege that he suffered any injuries from his encounter with the Defendants or that he sought or required any medical treatment. He does his best to characterize the conduct of the Defendant officers as reprehensible, and the Court does not doubt that he believes what he argues, but as stated above, his subjective perspective is not relevant. The Defendants correctly note that "'police are entitled to err on the side of caution when faced with an uncertain or threatening situation.'" Defendants' Reply (DE 29), p. 4 (quoting *Johnson v. Scott*, 576 F.3d 658, 659 (7th Cir. 2009)).

Given the totality of the circumstances that existed during Martin's encounter with the Defendant officers, virtually all of which is captured on the video and audio recordings in evidence in this case, and even drawing all reasonable inferences in his favor, no reasonable juror could find that the use of force to effectuate Martin's arrest was unconstitutionally excessive.

Since the Court concludes that Martin's excessive force claims fail as a matter of law, his *Monell* claim against the City of Fort Wayne, his state law battery claims against individual officers, and his claim against the City under *respondeat superior*, all must also be dismissed because they vanish if there is no underlying constitutional violation. "[A] *Monell* claim cannot stand on its own, there must be an underlying violation of a constitutional right, and since the complaint fails to state a claim based on the Fourth Amendment it also fails to state a claim

under *Monell* for those same acts." *Gonzalez-Koeneke v. Rockford Dist. 205*, 2014 WL 11370445, at *4 (N.D. Ill. June 16, 2014) (citing *Sallenger v. City of Springfield, Ill.*, 630 F.3d 499, 504 (7th Cir. 2010)) ("[A] municipality cannot be liable under *Monell* when there is no underlying constitutional violation by a municipal employee."). *See also*, *Petty v. City of Chicago*, 754 F.3d 416, 424 (7th Cir. 2014) ("[I]f no constitutional violation occurred in the first place, a *Monell* claim cannot be supported."). Accordingly, Defendant City of Fort Wayne is entitled to summary judgment in its favor on Martin's *Monell* claim.[6]

Martin's state law battery claims fail for the same reasons. Under Indiana law, "[a] law enforcement officer is justified in using reasonable force if the officer reasonably believes that the force is necessary to effect a lawful arrest." I.C. § 35-41-3-3. But in keeping with federal Fourth Amendment jurisprudence, Indiana law also mandates that "a police officer may use only the force that is reasonable and necessary for effecting an arrest. . . . If a police officer uses unnecessary or excessive force, the officer may commit the torts of assault and battery." *Fidler v. City of Indianapolis*, 428 F.Supp.2d 857, 866 (S.D. Ind. 2006) (citations omitted). Since Martin's federal excessive force claims fail, so too do his state battery claims, since they are analyzed

---

[6] The Court notes that Martin's *Monell* claim would fail in any event, since it is based solely on his own conclusory allegations and since he presents no evidence at all to support it. For that matter, he doesn't even present anything of substance in the way of argument on this claim. His complaint states in general terms that "the City of Fort Wayne . . . [is] sued in its official capacity for unconstitutional policies, customs, procedures, and/or practices which lead to the . . . use of excessive force upon the Plaintiff." Second Amended Complaint, p. 1. And Martin's brief in opposition to the motion for summary judgment provides neither argument nor evidence to support this claim. As this Court has explained before, simply paying "lip service" to such a claim is insufficient. "A plaintiff asserting a *Monell* claim cannot survive summary judgment when the plaintiff's claim rests solely on conclusory allegations of municipal policy and fails to allege any well pled facts of any occurrence or incidents other than the single incident involving the plaintiff." *Scott v. Buncich*, 2016 WL 5341309, *7 (N.D.Ind. Sept. 23, 2016) (citing *Strauss v. City of Chicago*, 760 F.2d 765, 767 (7th Cir. 1985)).

under the same standard. As a sister court noted recently, "Indiana's excessive force standard effectively parallels the federal standard. 'Any claim that excessive force was used by a police officer when making an arrest is analyzed under the reasonableness standard of the Fourth Amendment to the United States Constitution.'" *Thompson v. City of Indianapolis*, 2016 WL 5253198, at *6 (S.D.Ind. Sept. 22, 2016) (quoting *Brooks v. Anderson Police Dep't*, 975 N.E.2d 395, 399 (Ind.Ct.App. 2012)).

Since Martin's battery claims fail under the objectively reasonable test, just as his federal claims do, he cannot maintain a claim against the City of Fort Wayne under a theory of *respondeat superior*. "'[F]or respondeat liability to attach, there must also be underlying liability of the acting party.'" *Haywood v. Novartis Pharm. Corp.*, 2016 WL 5394462, at *2 (N.D.Ind. Sept. 27, 2016) (quoting *Walgreen Co. v. Hinchy*, 21 N.E.3d 99, 109 (Ind.Ct.App. 2014)). Just like *Monell* vicarious liability, "[u]nder the doctrine of respondeat superior, an employer is subject to liability for tortious acts of an employee committed within the scope of employment. . . . Therefore, summary judgment [in favor of] the employee on the underlying tort claim necessarily requires judgment in favor of the employer as to respondeat superior." *Scott v. Retz*, 916 N.E.2d 252, 257 (Ind.Ct.App. 2009) (citations omitted). For these reasons, the Defendants' motion for summary judgment is granted as to all of Martin's claims for battery, including those asserted against any individual Defendants and that asserted against the City of Fort Wayne under a theory of *respondeat superior*.

**II. Unreasonable search and seizure claims.**

The next issue in this case involves the search and seizure of Martin's vehicle. This issue, it turns out, is not amenable to determination on summary judgment, seeing as it requires a

weighing of evidence and credibility determinations, and so the Defendants' motion for summary judgment and Martin's motion for partial summary judgment are both denied.

Martin's claims are set out in his complaint as follows:

[T]he Defendant officers unlawfully seized Plaintiff's vehicle and also made an illegal search of it without probable cause, a warrant, or legal justification to do so, which also violated Plaintiff's constitutional rights under the Fourth Amendment. Defendant officers made the decision to tow and impound Plaintiff's vehicle even though a licensed driver was available and ready to drive Plaintiff's vehicle from the scene. Plaintiff was deprived of procedural due process under the Fourteenth Amendment, receiving no notice or opportunity to be heard prior to the "automatic towing and impoundment."

Second Amended Complaint, p. 4. The phrase "automatic towing and impoundment" is a reference to the Fort Wayne Police Department Motor Vehicle Tow and Inventory Policy. *See* Plaintiff's Motion for Partial Summary Judgment, Exh. A (DE 40-1); Defendants' Motion for Summary Judgment, Exh. G (DE 26-7). That policy reads in relevant part as follows:

I. Purpose:

The purpose of this policy is to provide officers with guidelines for the tow and inventory of motor vehicles. A motor vehicle tow and inventory is proper and warranted when part of a routine administrative caretaking function authorized by the department. It is designed to protect motor vehicles and their contents while in police custody; to protect the department and towing agencies against claims of lost, stolen or damaged property; and to protect departmental personnel and the public against injury or damaged property due to hazardous materials or substances that may be in the vehicle.

II. Policy:

It is the policy of this department to tow, inventory and impound motor vehicles whenever it is reasonably necessary to safeguard the vehicle and its contents, to facilitate public safety or to lawfully seize the vehicle and its contents for evidentiary purposes.

III. Procedures:

A. Legal Authority to Inventory Motor Vehicles

1. A sworn member of the Fort Wayne Police Department shall conduct a motor vehicle inventory without a warrant and probable cause when;

a. The vehicle has been lawfully seized or impounded pursuant to the arrest of the driver.

b. The vehicle is impounded for violations.

c. For other related enforcement or safety reasons as defined by Indiana State Law.

d. The vehicle posed a threat to the community or was itself imperiled.
. . .

B. Scope of Motor Vehicle Inventories

1. The contents of all motor vehicles that are lawfully impounded by the department shall be subject to inventory, in every case, in accordance with the provisions of the policy.

2. An inventory shall be conducted at the location where the vehicle is seized unless it is unsafe or impractical to do so . . . .

Defendants' Exh. G, pp. 1-2. There is no dispute that this policy was in effect on the day Martin's vehicle was seized. The Defendant officers made the decision to impound Martin's vehicle despite his protests and despite their knowledge that Je'Carri Martin had a valid Indiana driver's license and could have driven the vehicle from the scene. The Defendants maintain that this decision was made for purposes of public safety, given that the vehicle had been involved in an aggressive driving crime with another car and impounding it would ensure that the dangerous activity did not resume. As Officer Long put it in his affidavit: "I had Mr. Martin's vehicle towed because he was arrested for aggressive driving and the vehicle was involved in the offense. I was also concerned because the green vehicle involved in the incident had not been stopped and the

aggressive driving could have resumed had Mr. Martin's vehicle been driven from the scene."
Long Affidavit (DE 26-2), ¶ 30. Long also testified that "[b]ased on my knowledge, training, and
experience as a police officer, I know that dangerous aggressive driving situations like this one
can cause accidents or evolve into more dangerous situations, including shootings." *Id.*, ¶ 11.

Long's concerns seem reasonable on their face, especially given the actions of Martin and
the other driver, both of whom were endangering themselves, their passengers, and innocent
bystanders. And, unfortunately, it is not uncommon for "road rage" situations to end in violence.
But the circumstances in this case raise questions about the legitimacy of Long's expressed
concerns, and thereby the reasonableness of both the search and seizure of Martin's vehicle. It is
undisputed that Ms. Martin had a valid driver's license and that the officers (at least Long and
Demorest) were aware of that. It is undisputed that the green car involved in the incident had
driven away. It is undisputed that neither Martin nor his cousin Je'Carri knew who the driver of
the green car was (both can be heard on audiotape stating this fact, and Martin repeatedly refers
to the other driver simply as "the other guy" when he is protesting his arrest). It is undisputed that
Ms. Martin and Ms. Carswell were not arrested and had committed no crime. It is undisputed that
Ms. Martin and Ms. Carswell, once Martin was arrested, were responsible for the care and safety
of Martin's five-year-old daughter. It is undisputed that the driver who committed the offense of
aggressive driving had been arrested and so was no longer a danger. All of this notwithstanding,
Long made the decision to tow and impound Martin's vehicle because, he says, he feared that
more ruckus could ensue if he allowed Ms. Martin to drive the vehicle from the scene.

Martin challenges this argument, claiming it is bunk, and that the officers seized his vehicle when there was no objectively reasonable basis for doing so.[7] Martin's argument raises many questions. Was it reasonable to forbid Ms. Martin from driving Martin's vehicle from the scene when it is undisputed that she was not involved in the incident? Was it reasonable to fear that the two women and a five-year-old girl would leave and then engage in the same dangerous conduct? Was it reasonable for Long to fear that the green car would return to the scene and reinstigate trouble? Looked at another way, would it not be reasonable to assume the *opposite* of what Long assumed, that is, that Ms. Martin would have every reason to want to leave the scene and *not* get involved in another dust up with another driver or with police? Isn't it just as reasonable to assume that the driver of the green car–who almost certainly saw Long pull Martin over since that driver was only a few car lengths in front of Martin at the time–would be too busy counting his lucky stars to want anything to do with reinitiating the aggressive driving? Isn't it just as reasonable to assume that two women who had just spent an hour or so detained by police, part of that time in handcuffs, would be motivated to leave the scene and get home as quickly and uneventfully as possible?[8] The Court cannot answer these questions, of course, given that

---

[7]  Martin goes even further, referring to Long's explanation as "desperate," "absurd," and "ridiculous," and that's all on one page! Plaintiff's Reply in Support of Motion for Partial Summary Judgment (DE 55), p. 7.

[8] Martin states in his brief that "Ms. Martin, Ms. Carswell, and the five year-old little girl were left standing on the side of the road, holding a car seat and desperately making phone calls trying to find a ride, as the Defendant Officers departed the scene." Plaintiff's Memorandum in Support of Motion for Partial Summary Judgment (DE 41), p. 4. The Defendants maintain that this is an exaggeration, given that it implies that the officers left the women and a "little girl" stranded and "desperate," and claim that "Officer Long offered Mr. Martin's passengers a ride to a safe place where they could wait for someone to pick them up[,]" but the women "refused the offer." Defendants' Brief in Opposition to Motion for Partial Summary Judgment (DE 46), p. 2 (citing Long Affidavit ¶ 32 and Long in-car video at 28:12). Ms. Martin stated in her affidavit,

credility determinations would have to be made and evidence weighed before the reasonableness of the Defendants' actions in seizing Martin's vehicle can be determined. A jury could find the Defendants' explanation for the decision to search and seize Martin's car curious–and yes, even unreasonable–under the circumstances.

Martin argues that Long's stated reason for the seizure is nothing more than an attempt to evade the mandate of *United States v. Duguay*, 93 F.3d 346 (7th Cir. 1996). In *Duguay*, the Seventh Circuit held that warrantless automobile inventory searches, as well as warrantless impoundments of vehicles, are unreasonable in the absence of probable cause *and* where the arrestee or another person is available and able to remove the vehicle from the scene. The court explained as follows:

> The touchstone of Fourth Amendment analysis is "reasonableness." . . . . The policy of impounding the car without regard to whether the defendant can provide for its removal is patently unreasonable if the ostensible purpose for impoundment is for the "caretaking" of the streets. While it is eminently sensible not to release an automobile to the compatriots of a suspected criminal in the course of a criminal investigation, if the purpose of impoundment is not investigative, and in the absence of probable cause, we do not see what purpose denying possession of the car to a passenger, a girlfriend, or a family member could possibly serve.

*Duguay*, 93 F.3d at 353 (citations omitted). There is nothing ambiguous about that language, which is why Martin relies on this case to support his position. The Seventh Circuit explained in *Duguay* that its holding was in keeping with well-established law:

---

however, that she "asked Officer Long for a ride" but that "Officer Long told me he couldn't give us a ride and we would have to call someone to come get us." Affidavit of Je'Carri Martin (DE 40-8), ¶ 13. This factual dispute clearly involves a credibility determination–one of the two people has a faulty recollection or is lying–and the Court of course cannot make that determination. This fact is important since it is (at least arguably) relevant to the broader determination of whether the officers' decision to impound Martin's vehicle was reasonable under the circumstances.

The decision to impound an automobile, unless it is supported by probable cause of criminal activity, is only valid if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots. This conclusion is consistent with this court's inventory search precedents. *See, e.g.*, *United States v. Wilson*, 938 F.2d 785 (7th Cir.1991), *cert. denied* 502 U.S. 1062, 112 S.Ct. 946, 117 L.Ed.2d 115 (1992) (solo driver arrested); *United States v. Velarde*, 903 F.2d 1163 (7th Cir. 1990) (both passenger and driver had suspended licenses); *United States v. Griffin*, 729 F.2d 475 (7th Cir.), *cert. denied* 469 U.S. 830, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984) (driver lacked valid license, and passenger arrested for outstanding warrant).

*Id*. at 353-54. Martin is not contending that the Defendants' search of his vehicle, or its impoundment, would have violated his Fourth Amendment rights *had he been alone* when he was stopped and arrested.[9] But since licensed drivers–family members no less–were present and could have driven the vehicle, impoundment constituted an unreasonable seizure, thus rendering the inventory search likewise unreasonable.

According to Martin, the existence of the FWPD policy and the fact that the Defendants followed its provisions is not determinative and offers no defense, since the specific circumstances in this case make both the search and the seizure of his vehicle unreasonable as a matter of law–and he insists that *Duguay* supports his position unambiguously. Martin points out that "'[t]he existence of a police policy, city ordinance, or state law alone does not render a

---

[9] Warrantless impoundments have been held *not* to violate the Fourth Amendment where the arrestee could *not* provide for the speedy and efficient removal of the car, such as where the driver is the sole occupant and is legitimately arrested, *see, e.g.*, *United States v. Trevino*, 60 F.3d 333, 335 (7th Cir. 1995), *cert. denied* 516 U.S. 1061 (1996); or where no passenger has a valid license, *see, e.g.*, *United States v. Covarrubias*, 65 F.3d 1362 (7th Cir. 1995); or where all passengers are insufficiently sober to take charge of the car, *see, e.g.*, *United States v. Young*, 38 F.3d 338 (7th Cir. 1994). Had Martin been alone when he was arrested, or if Teron Walker (who was also arrested and who had no driver's license anyway) was the only passenger, he would have no Fourth Amendment claim. But it is undisputed that these were not the circumstances that existed at the time Martin was arrested.

particular search or seizure reasonable or otherwise immune from scrutiny under the Fourth Amendment.'" Plaintiff's Brief in Support, p. 9 (quoting *United States v. Cartwright*, 630 F.3d 610, 614 (7th Cir. 2010)). As Martin puts it, "the question is not whether the search or seizure was authorized by state law, but rather whether the search or seizure was reasonable under the Fourth Amendment. . . . Officers of the law do not get the option to search, tow, and impound a vehicle without a legitimate rationale for doing so. . . . 'Impoundment based solely on an arrestee's status as a driver, owner, or passenger is irrational and inconsistent with 'caretaking' functions.'" *Id.*, p. 10 (quoting *Duguay*, 93 F.3d at 352). Martin also argues that "[t]he policy relied on by the Defendants fails to incorporate the full holding of *Duguay*. Nowhere in the policy does it state that towing a vehicle is not permitted when another driver is available. Such automatic towing and seizure violates the vehicle owner's constitutional rights." *Id.* This is the foundational argument of Martin's *Monell* claim against the City, i.e., that following the policy under the circumstances of his case rendered both the search and the seizure unreasonable in light of *Duguay*.

Martin raises one final argument, which again goes to Long's credibility. Martin points out that "Long's Supplemental Narrative, . . . penned on June 27, 2014, makes absolutely no mention of the reason for towing Plaintiff's car[]" and that "the first time Long asserts any reason for the decision he made to tow Plaintiff's vehicle[]" was in his affidavit, which was made on March 14, 2016." *Id.*, p. 12.[10] According to Martin, this purported justification for towing his vehicle "comes nearly *two years* after the incident in question, and appears to be inserted in an

_____

[10] This is true. In his narrative, Long says only that Martin's "vehicle was towed by Kelley Wrecker[,]" but does not explain why.

attempt to satisfy *Duguay*, when *Duguay* could not otherwise be satisfied." *Id*.

For their part, the Defendants first try to argue that "*Duguay* is distinguishable from the facts here. The *Duguay* holding is limited to those cases where there is no comprehensive tow and impound policy." Defendants' Brief in Opposition, p. 5. Therefore, conclude the Defendants, "[u]nder the Fort Wayne Police Department policy, Mr. Martin's vehicle was towed and inventoried. Mr. Martin was the driver and his vehicle was impounded and inventoried pursuant to his arrest. Mr. Martin's vehicle posed a threat to the community. Mr. Martin's vehicle was impounded for enforcement and safety reasons as defined by Indiana State Law." *Id*., p. 6. In other words, the Defendants' claim they had a legitimate reason to inventory and impound the car (since they were arresting the driver), did so pursuant to the FWPD tow and impound procedure, and therefore there was no constitutional violation and *Duguay* is not applicable. This conclusion is wrong, and so is the Defendants' statement that the holding in *Duguay* "is limited to those cases where there is no comprehensive tow and impound policy."

The Defendants argue that *Duguay* is not applicable because it is factually distinguishable. They contend that "[t]he facts of the *Duguay* case are not at all like the facts in the present case. Unlike . . . Martin, Duguay was a passenger in a vehicle. Duguay's girlfriend drove the vehicle. Duguay's girlfriend parked in a parking lot, locked the car, and activated the car alarm. The couple exited the car and began walking towards the girlfriend's apartment. Marshals recognized Duguay. The marshals approached and stopped Duguay for questioning some distance from the car. Duguay struck a marshal with his elbow while the marshal was performing a pat down. Duguay was arrested for assault. Duguay told his girlfriend not to surrender the car keys. When the girlfriend would not surrender the keys, she was arrested for

29

obstruction of justice. An officer reached into her pocket to get the keys. The vehicle was inventoried incident to impoundment and a substantial amount of cocaine was found in the trunk. Duguay was charged with possession with intent to distribute the cocaine found in the car." Defendants' Brief in Opposition, pp. 7-8. The significant factual difference, according to the Defendants, is that "[h]ere, unlike *Duguay*, Mr. Martin was driving the vehicle. Mr. Martin was stopped and arrested for aggressive driving–an offense which directly involved the vehicle Mr. Martin was driving." *Id*., p. 8. For reasons the Court cannot quite comprehend, the Defendants claim that these factual differences mean that their decision to seize Martin's vehicle, seeing as it was done (ostensibly) for purposes of public safety *and* pursuant to a written policy, does not run afoul of *Duguay* because Martin was driving while Duguay was not. This argument makes no sense because it focuses on immaterial factual differences while ignoring material factual similarities. Also, while the factual scenarios in the two cases are different, the applicable law is not, a fact that the Defendants' argument conveniently ignores. The Seventh Circuit held that the seizure of Duguay's car was unreasonable since his girlfriend "had possession of the keys and was prepared to remove the car from the street[]" and "Duguay's brother . . . was also present at the time of the arrest." *Duguay*, 93 F.3d at 353. The court's holding was not based only on the absence of a standardized inventory and impound policy–and in fact the court took pains to point that out–but rather on the fact that other individuals were present and able to remove Duguay's vehicle from the scene, rendering the seizure and subsequent inventory search unreasonable. Duguay's status as a passenger in his vehicle rather than the driver was immaterial to the court's decision, and the Defendants' argument that this factual distinction is material in Martin's case is misguided.

After attempting to distinguish *Duguay* and challenge its applicability to the present facts, the Defendants return to their only argument on this issue–that notwithstanding the clear holding in *Duguay*, their decision to search and seize Martin's vehicle was reasonable since "[a]utomobiles are frequently taken into police custody in the interests of public safety and community caretaking functions." *Id*., p. 9 (citing *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)). That is a correct statement of the law and a correct statement of the holding in *Opperman*, but it doesn't change anything. Martin is not challenging the general principle that police can seize vehicles without a warrant after the arrest of the driver if circumstances justify it (as when it is seized for investigatory purposes or because it is a public hazard). Instead, he is challenging the constitutionality of the FWPD policy in a specific situation, i.e., when another driver is present and available to drive the vehicle from the scene. The Defendants' arguments dance around that core issue, but they refuse to engage it directly. Not only that, but their argument with regard to the applicable law basically stops with the *Opperman* case and ignores the development of Seventh Circuit law over the last 40 years regarding vehicle search and impoundment. The *Opperman* holding doesn't change anything in this case; the holdings in *Duguay* and *Cartwright* do.

Martin contends that the Defendants' arguments ignore the relevant undisputed facts of this case and adamantly maintains that their actions in searching and impounding the vehicle (and, therefore the City of Fort Wayne's *Monell* liability for having an unconstitutional tow policy) are "in contravention of Seventh Circuit law[]" as set forth . . . *Duguay*. Plaintiff's Brief in Support of Motion for Summary Judgment (DE 41), p. 1. According to Martin, the "Seventh

Circuit . . . has directly addressed the question of whether it is lawful for an officer to seize a vehicle where a licensed driver is present and ready to drive the vehicle in lieu of seizure, towing, and impoundment." Plaintiff's Response in Opposition, p. 12. Martin's position is that the *Duguay* case answers this question with an emphatic "No!"

Martin is correct that the existence of the FWPD impound policy is not determinative. "The existence of a police policy, city ordinance, or state law alone does not render a particular search or seizure reasonable or otherwise immune from scrutiny under the Fourth Amendment." *Cartwright*, 630 F.3d at 614-15 (citing *Sibron v. New York*, 392 U.S. 40, 61 (1968)) ("The question in this Court upon review of a state-approved search or seizure is not whether the search (or seizure) was authorized by state law. The question is rather whether the search was reasonable under the Fourth Amendment."); *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005) (explaining that "the decision to impound pursuant to the authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment").

The Defendants retort by noting that "[t]he Fourth Amendment does not require that the police offer . . . alternatives to impoundment." Defendants' Brief in Opposition (DE 46), p. 10 (citing *Colorado v. Bertine*, 479 U.S. 367, 373-74 (1987)) (holding that the police need not give a motorist "an opportunity to make alternative arrangements" that avoid impoundment and inventory); [*U.S. v.*] *Cherry*, 436 F.3d [769,] 775 (7th Cir. 2006) (stating that officers need not invite or accept input from the motorist as to the appropriate disposition of his vehicle; "nor does the Fourth Amendment demand that police offer a motorist an alternative means of removing his vehicle that will avoid the need to tow it and conduct an inventory search"). The Defendants

contend that "[t]he *Bertine* Court concluded that 'reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure.' *Duguay* in no way trumps this controlling United States Supreme Court precedent." *Id*. (quoting *Bertine*, 479 U.S. at 374. The Defendants are correct that *Duguay* does not "trump" *Bertine*; but it doesn't work the other way either, which is what the Defendants' argument implies. The rule of *Duguay* is that it is unreasonable to seize a vehicle belonging to an arrestee if the vehicle is not being seized for investigative purposes and there is a licensed driver available to remove the arrestee's vehicle from the scene. This has nothing to do with *Bertine* and does not conflict with its holding. The Court in *Bertine* merely stated the obvious–that it is *not* unreasonable for police to conduct an inventory search of a vehicle when they do so pursuant to established procedure *and* when that policy is "reasonable" under the circumstances. In other words, *Bertine* does not affect the applicability of *Duguay*, i.e., it does not remove the issue of reasonableness, which remains the quintessential question in this case. As Martin puts it, the "Defendants argue that so long as Fort Wayne had a tow/impound policy–even if that policy violated *Duguay* by disallowing an on-scene family member to take the vehicle–then *Duguay* does not apply!?!" Plaintiff's Reply (DE 55), p. 6 (punctuation in original). As Martin points out, "*Colorado v. Bertine*, . . . decided nearly thirty years ago, and eleven years prior to *Duguay*, is of little help to the Defendants. No court has ever ruled that *Duguay* and *Bertine* are at odds with one another, or there exists tension between the two cases. They stand for different propositions." *Id*., p. 8.

Yet again the Defendants' argument, or more specifically their legal reasoning, stops short.[11] They never venture beyond their basic argument–that they had the authority and even the duty, pursuant to the FWPD policy, to search and impound Martin's vehicle given the circumstances they encountered because Martin was legally arrested and seizure of his vehicle was necessary to "facilitate public safety" as part of the police "caretaking function." They claim that Long's decision to impound Martin's vehicle was reasonable under the language of the policy, which to review, states that "[i]t is the policy of this department to tow, inventory and impound motor vehicles whenever it is reasonably necessary to safeguard the vehicle and its contents, [or] to facilitate public safety," and mandates that a police officer "shall conduct a motor vehicle inventory without a warrant and probable cause when . . . [t]he vehicle has been lawfully seized or impounded pursuant to the arrest of the driver[]" . . . or "[f]or other related enforcement or safety reasons as defined by Indiana State Law." Defendants' Exh. G, pp. 1-2. That language is sweeping in its scope, which is precisely Martin's point. It is so sweeping that it swallows up Martin's well-established right not to have his vehicle searched or seized under the circumstances that existed when the Defendants did both. The policy does not accommodate the holdings of *Duguay* and *Cartwright*, or worse, flat out ignores them, and the Defendants'

---

[11] The Defendants' reasoning did advance, at least from a chronological perspective, in that they went from discussing the 1976 holding in *Opperman* to discussing the 1987 holding in *Bertine*. But as another district court noted, "[t]he Seventh Circuit case law surrounding the relationship between department policies and reasonable impound of vehicles under the Fourth Amendment evolved from the 1996 case of *Duguay* to the 2010 case of *Cartwright* to clarify that the existence of a standardized, comprehensive policy, alone, is not sufficient basis for constitutional rationale of reasonable impound." *Thompson v. Vill. of Monee*, 110 F.Supp.3d 826, 852 (N.D. Ill. 2015) (citing *Cartwright*, 630 F.3d at 614). The Court's criticism of the Defendants' arguments and legal reasoning is not a criticism of their very capable attorney, who does the best she can in terms of argument given how little fodder she has to work with (at least as to Martin's Fourth Amendment claims).

arguments and reasoning do the same thing. To put it more succinctly, Martin contends that the Defendants are missing the point, and that the existence of the FWPD tow and inventory policy doesn't change anything; first because its existence does not isolate the decisions to search and seize Martin's vehicle from Fourth Amendment scrutiny, and second because it makes no allowances for situations like Martin's and is therefore unconstitutional in those specific situations.

Martin presented this same issue to this Court in *Martin v. City of Fort Wayne*, 1:15-CV-384, a potential class action lawsuit filed shortly after this case. In his complaint in that case Martin seeks class certification to pursue these same Fourth and Fourteenth Amendment claims on behalf of all similarly situated individuals (meaning individuals who had their vehicles towed when a licensed driver was present *and* when the vehicle was *not* seized for investigative purposes). Judge Springmann summarized the issue and the parties' respective arguments as follows:

> The Defendant disagrees with the Plaintiff's premise for the constitutional challenge, arguing that the Fourth Amendment does not require police to provide an arrestee with the option to allow another occupant to operate the vehicle when the driver's "vehicle is seized in connection with the arrest." . . . This disagreement goes to the merits of the suit. Whether the Defendant has a practice of automatically towing vehicles whenever a driver is arrested without consideration of whether another person on the scene could remove it and, if so, the constitutionality of such a policy, is the issue before the Court. . . . In other words, [Martin is] attempting to answer the question, "why was my car towed?" by pointing to towing practices that did not properly fall within the community caretaking exception to the warrant requirement. . . . [I]f the Plaintiff's allegations are believed, [the case] is about the *absence* of any real case-by-case decision making in favor of a policy that automatically resulted in towing.

*Martin v. City of Fort Wayne*, 2016 WL 5110465, at *6 (N.D. Ind. Sept. 20, 2016) (italics in

original).[12] That hits the nail on the head. Martin is challenging the decision to search and seize his car under specific circumstances, not the constitutionality of the FWPD policy *per se* (which for purposes of his position is almost irrelevant). The Defendants, however, are defending the *policy* by arguing that their "caretaking function" trumps Martin's Fourth Amendment argument and because Long articulated a reasonable basis for the impoundment of Martin's vehicle pursuant to that policy. The problem is that this argument *assumes* that Long's explanation for his decision to impound the vehicle was a reasonable one in the first place. Only a jury can make that determination, given that it involves both credibility determinations (was Long's decision really based on his expressed concerns, or were the Defendant officers using the policy as a "ruse for general rummaging in order to discover incriminating evidence?") and a weighing of the evidence (was it reasonable to seize the vehicle after the aggressive driver was arrested and when Ms. Martin could have driven it from the scene?). It is undisputed that Martin's vehicle was not seized for investigative purposes, so the "caretaking function" is the only basis by which the Defendants can justify their decision. The reasonableness of that decision is the ultimate question, but the answer can only come from a jury, who can weigh the evidence and make the credibility determinations necessary to determine reasonableness under the circumstances of this case.

Martin insists that the inventory search of his vehicle was likewise unreasonable under the Fourth Amendment. In *Trigg v. City of Fort Wayne*, a case that involved the same FWPD

---

[12] *See Martin v. City of Fort Wayne*, No. 1:15-CV-384, Opinion and Order (DE 35). Shortly after Judge Springmann's order was entered the parties consented to have that class action complaint heard by U.S. Magistrate Judge Susan Collins, who is now presiding over the case (DE 44).

inventory policy at issue in this case, this Court (Judge Lozano) summarized Fourth Amendment

law as it applies to inventory searches, explaining as follows:

> The Fourth Amendment prohibits warrantless searches, unless the search falls under one of the recognized exceptions to the warrant requirement. *U.S. v. Denney*, 771 F.2d 318, 320 (7th Cir. 1985). Automobile inventory searches constitute one such exception. See *U.S. v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006) (citing *U.S. v. Wilson*, 938 F.2d 785, 788 (7th Cir. 1991)). "Searches conducted by the police prior to towing a car are lawful if conducted pursuant to standard police procedures aimed at protecting the owner's property–and protecting the police from the owner's charging them with having stolen, lost, or damaged his property." *Id.* (internal quotation marks and citation omitted). As noted by the Seventh Circuit, the Supreme Court has recognized that:
>
>> [L]ocal police departments routinely inventory and secure the contents of impounded automobiles. Doing so protects the police from potential danger, protects the owner's property while it remains in police custody, and protects the police against claims of lost, stolen, or damaged property. An inventory search is lawful if (1) the individual whose possession is to be searched has been lawfully arrested, and (2) the search is conducted as part of the routine procedure incident to incarcerating an arrested person and in accordance with established inventory procedures. *Both the decision to take the car into custody and the concomitant inventory search must meet the strictures of the Fourth Amendment.*

*Trigg v. Fort Wayne Police Dep't.*, 2016 WL 1089842, at *7 (N.D. Ind. Mar. 21, 2016) (quoting

*Cartwright*, 630 F.3d 610, 613 (7th Cir. 2010)) (italics added). In this case, the search of Martin's

vehicle met both elements (1) and (2), and if the inquiry stopped there the Defendants' arguments

might prevail (or at least hold water). But it's the sentence in italics that dooms those arguments.

It is axiomatic that inventory searches are long recognized exceptions to the warrant and

probable cause requirements of the Fourth Amendment. *United States v. Wilson*, 938 F.2d at 788.

Inventory searches prior to towing a vehicle are "lawful if conducted pursuant to standard police

procedures aimed at protecting the owner's property–and protecting the police from the owner's

charging them with having stolen, lost, or damaged the property." *United States v. Cherry*, 436

F.3d at 772 (quoting *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005)). Compliance with a municipality's procedural requirements is necessary to prevent an inventory search from being used as a "'ruse for general rummaging in order to discover incriminating evidence.'" *Posey v. Pruger*, 2015 WL 5610764, at *11 (N.D. Ill. Sept. 22, 2015) (quoting *Florida v. Wells*, 495 U.S. 1, 4 (1990)). But it is likewise true that even if an officer's decision to conduct an inventory search is made pursuant to a department policy, it remains subject to Fourth Amendment scrutiny.

This Court is mindful of the general rule that "[t]he decision to impound (the 'seizure') is properly analyzed as distinct from the decision to inventory." *Cartwright*, 630 F.3d at 613. In this case, however, it is clear that the reasonableness of the latter turns on the reasonableness of the former. Martin's claim based on the search of his vehicle survives summary judgment for the same reasons his claim for illegal seizure survives–if his allegations are believed, both violated the well-established rule enunciated in *Duguay*, *Cartwright*, and many other cases.

One final point needs to be made regarding Martin's search and seizure claims. Neither Martin nor the Defendants address the issue of whether any of the Defendant officers other than Long can be held liable for the alleged illegal seizure of Martin's vehicle. Long states that he made the decision to seize Martin's car. Defendants' Designation of Evidence, Exh. B, Long Affidavit (DE 26-2). Defendant Grooms makes no mention of the seizure in his affidavit. *Id.*, Exh. C, Grooms Affidavit (DE 26-3). Defendant Demorest states that he "signed the tow and inventory form for Mr. Martin's vehicle." *Id.*, Exh. D, Demorest Affidavit (DE 26-4). Defendant Hughes also does not mention the seizure of the vehicle in his affidavit, explaining that his role during the encounter was primarily limited to "assist[ing] with securing the occupants of [Martin's] vehicle[.]" *Id.*, Exh. E, Hughes Affidavit (DE 26-5). Finally, Defendant Pruser mentions the

seizure of the vehicle, but does not state whether he had any participation in that decision. Pruser states only that Martin's "vehicle was inventoried and a wrecker was called." *Id.*, Exh. A, Pruser Affidavit (DE 26-1). The reason this is important is because even the officers who did not directly participate in the decision to seize Martin's car could be held liable if a jury determines that they failed to intervene to prevent the alleged Fourth Amendment violation, i.e. if they had a reasonable opportunity to prevent the seizure of the vehicle but failed to do so. Claims against defendants based on failure to intervene theories are not limited to excessive force claims–they can be asserted anytime a plaintiff claims that officers failed to act to prevent a constitutional deprivation. "An officer who fails to intervene may be liable under 42 U.S.C. § 1983 if that officer had reason to know: '(1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, *or (3) that any constitutional violation has been committed by a law enforcement official*; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring.'" *Murphy v. Alford*, 2013 WL 3043675, at *7 (S.D. Ind. June 17, 2013) (quoting *Yang v. Hardin,* 37 F.3d 282, 285 (7th Cir. 1994)) (italics added); *see also, Miller v. City of Harvey*, 2014 WL 3509760, at *3 (N.D. Ill. July 15, 2014) (citing *United States v. James*, 571 F.3d 707, 713 (7th Cir. 2009) (the Fourth Amendment protects a citizen's interest in retaining possession of property). A seizure of personal property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 61 (1992).

While it is undisputed that Long made the decision to impound Martin's vehicle, he is not the only Defendant who can be held liable for that decision. The other officers on the scene could also be held liable for failing to intervene to prevent the seizure of Martin's vehicle, i.e., failing to

prevent an illegal seizure of personal property. Accordingly, Martin's Fourth Amendment claim based on the illegal seizure of his vehicle survives summary judgment as to *all* the Defendants, not just Long. The same holds true for the alleged illegal inventory search. It is not completely clear which officers participated in that search, although at one point in the videotape *all* of the Defendant officers are seen looking into the back of Martin's vehicle and moving things around during the inventory. Therefore, all of the Defendant officers remain potentially liable for their role in the allegedly illegal search *or* for failing to intervene to stop it.

The Court cannot conclude as a matter of law that the officers' actions were reasonable under the circumstances, and the Defendants' motion for summary judgment must therefore be denied as to Martin's search and seizure claims. At the same time, the Court also cannot conclude that the Defendants' actions were *unreasonable* as a matter of law. While the facts of this case appear to invoke the rule of *Duguay*, the fact that a licensed driver was present and able to remove Martin's vehicle does not automatically mean that the Defendants acted in contravention of *Duguay*. A seizure might still be constitutional even if another licensed driver is present at the arrest of the owner/driver. As Judge Springmann pointed out in her order in Martin's proposed class action suit, even if the FWPD policy "was determined to be unconstitutional, that policy would not cause a deprivation in all circumstances. *See, e.g.*, *Cartwright*, 630 F.3d at 616 (holding that car was not lawfully operable because it did not have functional license plate lamp as required by Indiana law)." *Martin v. City of Fort Wayne*, 2016 WL 5110465, at *3. While the facts of this case do not indicate that any such mechanical or other problem prevented Ms. Martin from driving her cousin's vehicle from the scene, a jury could conclude that Long's explanation for his decision was reasonable under the circumstances even in light of *Duguay*, after assessing the

40

evidence and judging the credibility of the witnesses. For all of these reasons, the Court denies both the Defendants' motion for summary judgment and the Plaintiff's motion for partial summary judgment as to Martin's Fourth and Fourteenth Amendment claims based on the search and seizure of his vehicle.

### III. Qualified immunity.

The Defendant officers argue that they are entitled to qualified immunity against Martin's claims. They contend that Martin fails to establish that he suffered any violation of his Fourth Amendment rights and, even assuming he did, the Defendant officers could not have known that their actions in searching and seizing his vehicle would violate that right. This argument is unavailing under the facts of this case.

The doctrine of qualified immunity "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Weinmann v. McClone*, 787 F.3d 444, 447-48, (7th Cir. 2015) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818, (1982)). The doctrine "strikes a balance between 'protecting a government official's ability to function without the threat of distraction and liability' and 'affording members of the public the ability to vindicate constitutional violations by government officials who abuse their offices.'" *Weinmann*, 787 F.3d at 447-48 (citing *Gibbs v. Lomas*, 755 F.3d 529, 535 (7th Cir. 2014)). In order to evaluate a qualified immunity defense, a court must assess "(1) whether the facts, taken in the light most favorable to the plaintiff, depict a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Weinmann*, 787 F.3d at 447-48 (citing *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013)); *see also*

*Saucier v. Katz*, 533 U.S. 194, 202 (2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted").

In the case at hand, Martin has presented sufficient evidence and legal authority to raise a genuine issue of material fact as to his claim for illegal search and his claim for illegal seizure, and his right to be free from such conduct was clearly established at the time of the underlying violation (under *Duguay* and progeny as discussed above). Accordingly, the Court cannot conclude that the Defendant officers are entitled to qualified immunity as a matter of law and their motion for summary judgment on this issue is denied.

**IV. Punitive damages**.

Finally, the Defendants argue that they are entitled to summary judgment on Martin's claim for punitive damages because such damages are only available "'when the defendant's conduct is shown to be motivated by evil intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" Defendants' Memorandum in Support, p. 22. The Defendants claim that "[i]n this case, there is no evidence that any of the defendants' actions" were the result of any evil intent or even reckless indifference to Martin's rights and so "summary judgment should be granted on the punitive damages claim asserted against [the Defendant officers]." *Id*. That's not much of an argument, given that all it does it state the general law regarding when punitive damages are available. But Martin's response in opposition is equally undeveloped. He simply states that "a jury could reasonably infer that Defendant Officers had the requisite mind set so as to assess punitive damages." Plaintiff's Response in Opposition, p. 19. In light of the Court's conclusion on the search and seizure issues, i.e., that a jury could

reasonably find in favor of Martin on those claims, his punitive damages claim should also be resolved by that jury. A jury might conclude, for example, that the search of Martin's vehicle was a "ruse for general rummaging in order to discover incriminating evidence[,]" *Florida v. Wells*, 495 U.S. at 4, or that the Defendants' explanation for the decision to impound the vehicle is not worthy of credence, and that punitive damages are warranted. For these reasons, the Defendants' motion for summary judgment on the issue of punitive damages is denied.

## CONCLUSION

For the reasons discussed above, the Defendants' motion for summary judgment (DE 26) is GRANTED in part and DENIED in part; and the Plaintiff's motion for partial summary judgment (DE 40) is DENIED. The Defendants' motion is: GRANTED as to Plaintiff's claims against the individual Defendants for excessive force, failure to intervene, and battery; and GRANTED as to the Plaintiff's claims against the City of Fort Wayne under *Monell v. Dept of Soc. Svcs.* and under *respondeat superior* (based on the same allegations of excessive force and battery). The Defendants' motion is DENIED as to the issue of qualified immunity and DENIED as to the Plaintiff's claim for punitive damages. Both the Defendants' motion for summary judgment and the Plaintiff's motion for partial summary judgment are DENIED as to the Plaintiff's Fourth and Fourteenth Amendment claims against all Defendants for the alleged illegal search and seizure of his vehicle and those claims remain pending.

Dated: January 12, 2017.

   /s/  William C. Lee   
William C. Lee, Judge
United States District Court
Northern District of Indiana